**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE

2007 SEP 20  P 3: 27

U.S. DISTRICT COURT
DISTRICT OF MASS.

UNITED STATES OF AMERICA and )
COMMONWEALTH OF MASSACHUSETTS  ex rel. )
JOSEPH HARRINGTON and DONALD E. FINNEY, )
    Plaintiffs, )
     )
     )
v. )
     ) Civil Action No. 05-11364-WGY
AGGREGATE INDUSTRIES, INC., f/k/a BARDON )
GROUP, INC., AGGREGATE INDUSTRIES- )
NORTHEAST REGION, INC., f/k/a BARDON )
TRIMOUNT, INC., f/k/a SIMEON CORPORATION, f/k/a ) **FILED UNDER SEAL**
J.H. MCNAMARA INCORPORATED, F/K/A AS&G )
CORPORATION f/k/a LRM CONCRETE, CORP., f/k/a )
COAST CONCRETE CO., INC., f/k/a ESSEX )
BITUMINOUS CORP., f/k/a T & T LEASING CORP., )
f/k/a G & F LEASING CORP., f/k/a BNT SAND AND )
GRAVEL CO., INC., f/k/a CONCRETE SERVICES INC., )
f/k/a HOT-TOP PAVEMENTS INCORPORATED, f/k/a )
NEEDHAM SAND AND GRAVEL COMPANY, )
MIDDLESEX MATERIALS, INC., f/k/a AGGREGATE )
INDUSTRIES ACQUISITI, f/k/a BARDON TRIMOUNT, )
INC., f/k/a SIMEON CORPORATION, f/k/a MIDDLESEX )
MATERIALS, LLC, f/k/a MIDDLESEX PAVING CORP., )
f/k/a HIGHWAY PAVING INC., f/k/a SAROA BROS., )
INC., and BARDON TRIMOUNT, INC., f/k/a A S & g )
CORPORATION f/k/a LRM CONCRETE, CORP., f/k/a )
COAST CONCRETE CO., INC., f/k/a ESSEX )
BITUMINOUS CORP., f/k/a T & T LEASING CORP., )
f/k/a G & f LEASING CORP., f/k/a B N T SAND AND )
GRAVEL CO., INC. f/k/a CONCRETE SERVICES, INC., )
f/k/a J.H. MCNAMARA INCORPORATED. )
     )
     )
    Defendants. )
     )

### THE GOVERNMENT'S NOTICE OF ELECTION TO INTERVENE
### FOR PURPOSES OF SETTLEMENT

Pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(2) and (4), the United States

notifies the Court that it hereby intervenes in this action, for settlement purposes, against the

Defendants. A copy of the Settlement Agreement is attached as an exhibit to this Notice of

Election to Intervene.

The Government requests that the following be unsealed: the relators' Amended Complaint, the Stipulation of Dismissal, together with this Notice of Intervention and proposed Order. The United States requests that all other papers on file in this action remain under seal because in discussing the content and extent of the United States' investigation, such papers are provided to the Court alone for the sole purpose of evaluating whether the seal and time for making an election to intervene should be extended.

The United States further notifies the Court that it is anticipated that notwithstanding the Stipulation of Dismissal in this matter, certain payments related to this Settlement Agreement will continue to be made to the Registry of Court pursuant to a separate Order entered in one of the matters referenced in the attached Settlement Agreement.

The United States requests that this Court retain jurisdiction over this matter to enforce this Order and the terms of the Settlement Agreement.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    Jeffrey M. Cohen
Assistant United States Attorney

Dated: September 20, 2007

2

## SETTLEMENT AGREEMENT

### I. PARTIES

This Civil Settlement Agreement ("Agreement") is entered into this 26th day of July 2007, between the UNITED STATES OF AMERICA, acting through the Department of Justice and the United States Attorney's Office for the District of Massachusetts; the COMMONWEALTH OF MASSACHUSETTS, acting through the Attorney General for the Commonwealth of Massachusetts ("the Commonwealth of Massachusetts" or "Commonwealth"), (hereinafter collectively "the Government"); the Relators as identified in Paragraphs B through E of the Recitals to this Agreement ("Relators"); and Defendants, Aggregate Industries Northeast Region, Inc. F/K/A Bardon Trimount, a Massachusetts corporation with a principal place of business in Saugus, Massachusetts; Aggregate Industries Management, Inc., a Delaware corporation with a principal place of business in Rockville, Maryland (Aggregate Industries Northeast Region, Inc. and Aggregate Industries Management, Inc. are hereinafter collectively referred to as "Aggregate"), through their authorized representatives. Collectively, all of the above will be referred to as "the Parties."

### II. RECITALS

A. WHEREAS, at all relevant times, Aggregate manufactured, sold, and delivered redi-mixed concrete to the Central Artery/Third Harbor Tunnel Project ("the Big Dig") in Boston, Massachusetts;

B. WHEREAS, on or about, May 16, 2005, Timothy Chase, Jr., one of the Relators, filed a *qui tam* action in the Superior Court of the Commonwealth of Massachusetts captioned Commonwealth of Massachusetts ex rel. Chase v. Aggregate Industries, Inc et al., Suffolk Superior Court Civil Action No. 2005-1936;

C. WHEREAS, on or about, June 25, 2005, Donald E. Finney and Joseph Harrington, jointly Relators, filed a *qui tam* action in the United States District Court for the District of Massachusetts captioned United States ex rel. Harrington and Finney v. Aggregate Industries, Inc. et al., Civil Action No. 05-11364-WGY (D. Mass); and, on or about July 6, 2005, Finney and Harrington filed an Amended Complaint in the same court under the same caption and case number which added the Commonwealth of Massachusetts as a plaintiff;

D. WHEREAS, on or about, August 3, 2005, Timothy Chase, Jr., the same individual from Paragraph B above, filed a *qui tam* action in the United States District Court for the District of Massachusetts captioned United States ex rel. Chase v. Aggregate Industries, Inc. et al., Civil Action No. 05-11586-GAO (D. Mass);

E. WHEREAS, on or about, August 9, 2006, Daniel E. Johnston, filed a *qui tam* action in the United States District Court for the District of Massachusetts captioned United States ex rel. Johnston v. Aggregate Industries PLC et al., Civil Action No. 06-11379-GAO (D. Mass) (the four *qui tams* listed in Paragraphs B, C, D and E are herein referred to as the "Civil Actions")

F. WHEREAS, Aggregate Industries Northeast Region, Inc., has agreed to enter into a plea agreement with the United States Attorney for the District of Massachusetts (the "Plea Agreement"), under which, if the Plea Agreement is approved by the Court, Aggregate Industries Northeast Region, Inc. will enter a plea of guilty pursuant to Fed. R. Crim. P. 11(c)(1)(C) to an Information to be filed in the U.S. District Court for the District of Massachusetts that will allege that Aggregate Industries Northeast Region, Inc. violated 18 U.S.C. § 286 by conspiring to submit false or fraudulent claims to the Government (the "Federal Criminal Action");

G. WHEREAS, Paragraph 2 of the Plea Agreement contains a statement of the gross loss to the United States and the Commonwealth from AI NE's non-conforming concrete.

- 3 -

H. WHEREAS, the United States contends that it has civil claims under the False Claims Act, 31 U.S.C. §§ 3729-3733, and other common law claims, against Aggregate for engaging in the following conduct with respect to the manufacturing, delivery and sale of redi-mix concrete (hereinafter "concrete") to the Big Dig, and the Commonwealth of Massachusetts contends that it has civil claims under the Massachusetts False Claims Act, M.G.L. c. 12 §§ 5A-5O, and other common law claims with respect to the manufacturing, delivery and sale of redi-mix concrete to the Big Dig:

(i) The Government alleges that, from as early as approximately October 1996, Aggregate conspired to sell to general contractors on the Big Dig approximately 5,700 loads of out of specification redi-mix concrete as described below (hereinafter referred to as "the Covered Conduct"). The 5,700 loads were non-conforming loads either because they contained a full load of non-conforming concrete that was represented to the Big Dig inspectors as conforming or because the load was partially conforming and was mixed with a partial load of non-conforming concrete. As part of Aggregate's scheme, Aggregate mixed concrete left over from other jobs with fresh concrete and delivered this mixture of old and new concrete to contractors on the Big Dig. Additionally, Aggregate rerouted concrete that had already been rejected by Big Dig inspectors back to different locations at the Big Dig project. In order to deceive Big Dig inspectors and conceal the scheme, Aggregate often added extra water to loads to make the concrete appear freshly batched or add fresh concrete to a partial non-conforming load. To further conceal the scheme and deceive inspectors, Aggregate generated false records that stated that the out-of-specification concrete was actually within specification. Specifically, the false records misstated the mix of concrete and the time the concrete was batched;

- 4 -

I. WHEREAS, with the exception of such admissions as Aggregate Northeast Region, Inc. makes in connection with any guilty plea to the Information referenced in Paragraph F above and accepted by the Court, this Agreement is neither an admission of facts nor liability by Aggregate. Nor is this Agreement a concession by the Government that its claims are not well-founded;

J. WHEREAS, this Agreement is intended to settle the United States' and Commonwealth's claims, as defined herein, for the Covered Conduct;

K. WHEREAS, the Department of Transportation contends that it has certain administrative claims against Aggregate that include engaging in the Covered Conduct;

L. WHEREAS, the United States, the Commonwealth of Massachusetts and the Relators have reached an agreement with respect to the Relators' claim of entitlement under 31 U.S.C. § 3730(d) and M.G.L. c. 12 §§ 5A-5O to a share of the proceeds of this Settlement Agreement devoted to settlement of the State and Federal False Claims Act claims and the United States and the Commonwealth of Massachusetts have reached an agreement to dispose of certain claims asserted by the Relator in Paragraph E above;

M. WHEREAS, the Relators and Aggregate have not yet reached an agreement with respect to the Relators' claim of entitlement under 31 U.S.C. § 3730(d) to attorney's fees and costs and want to reserve this issue from this Agreement; and

N. WHEREAS, to avoid the delay, expense, inconvenience and uncertainty of protracted litigation of these claims, the Parties mutually desire to reach a full and final settlement as set forth below:

- 5 -

## III. **TERMS AND CONDITIONS**

NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations in this Agreement, and for good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

1.    Aggregate shall pay to the United States and the Commonwealth of Massachusetts, collectively, the sum of $42,720,000, plus interest at the Debt Collection Act post-judgment rate of 4.96% per annum from the date the payments under subparagraphs A, B and C(1) below are made and continuing until and including the day before complete payment is made (the "Settlement Amount"). This sum shall constitute a debt immediately due and owing to the United States on the satisfaction of the conditions of payment set forth in Subparagraphs A and C of this Paragraph and to the Commonwealth of Massachusetts on the satisfaction of the conditions of payment set forth in Subparagraph B and C of this Paragraph. This debt is to be discharged by payments to the United States and the Commonwealth of Massachusetts under the following terms and conditions:

A.    Aggregate shall pay to the United States the sum of $9,343,985.40 (the "Federal False Claims Settlement Amount"). The Federal False Claims Settlement Amount shall be paid by electronic funds transfer no later than ten (10) business days after Aggregate receives written payment instructions from the United States and following the latest of the dates on which the following occurs: (1) this Agreement is fully executed by the Parties and delivered to Aggregate's attorneys; or (2) the Court accepts a Fed. R. Crim. P. 11(c)(1)(C) guilty plea from

- 6 -

Aggregate as described in Paragraph F of the Recitals in connection with the Federal Criminal Action.

B.    Aggregate shall pay to the Commonwealth of Massachusetts the sum of $6,229,323.60 (the "State False Claims Settlement Amount"). The State False Claims Settlement Amount shall be paid by electronic funds transfer no later than ten (10) business days after Aggregate receives written payment instructions from the Commonwealth of Massachusetts and following the latest of the dates on which the following occurs: (1) this Agreement is fully executed by the Parties and delivered to Aggregate's attorneys; or (2) the Court accepts a Fed. R. Crim. P. 11(c)(1)(C) guilty plea from Aggregate as described in Paragraph F of the Recitals in connection with the Federal Criminal Action.

C.    Aggregate shall pay to a payee to be designated by the United States and the Commonwealth of Massachusetts the amount of $27,146,691, plus interest accrued thereon at the rate of 4.96% per annum from the date the first payment under sub-paragraph (1) below is made and continuing until and including the day before complete payment is made (the "Fund Amount"). The Fund Amount shall be made in six (6) payments as described below. The first payment of the Fund Amount shall be paid by electronic funds transfer no later than ten (10) business days after Aggregate receives written payment instructions and following the latest of the dates on which the following occurs: (1) this Agreement is fully executed by the Parties and delivered to Aggregate's attorneys; or (2) the Court accepts a Fed. R. Crim. P. 11(c)(1)(C) guilty plea from Aggregate as described in Paragraph F of the Recitals in connection with the Federal Criminal Action. The payments (including interest) comprising the Fund Amount shall be as follows:

- 7 -

(1) First Payment: $2,146,691;

(2) Second Payment - $6,240,000 (one year from First Payment);

(3) Third Payment - $5,992,000 (two years from First Payment);

(4) Fourth Payment - $5,744,000 (three years from First Payment);

(5) Fifth Payment - $5,496,000 (four years from First Payment);

(6) Sixth Payment - $5,248,000 (five years from First Payment);

The time period between the First Payment and up to and including the Sixth Payment is hereby referred to as the "Payment Period". Aggregate is permitted to make these payments sooner than specified in the above schedule. If Aggregate makes a payment sooner than specified in the above schedule, Aggregate will be charged interest only up until the time of payment.

It is the desire and intent of the United States, the Commonwealth, and Aggregate that the Fund Amount be placed in a fund established by the Commonwealth of Massachusetts. The fund would be created for the sole purpose of endowing the Central Artery Third Harbor Tunnel Project with funds that can be used in the future solely for repairs and maintenance of the Big Dig structures, the precise terms to be agreed upon solely by the United States and the Commonwealth of Massachusetts. The Commonwealth of Massachusetts will endeavor to create such a fund for the specified purpose. However, if the fund is not established or authorized by a date 30 days after the Second Payment is made by Aggregate, or as otherwise agreed upon by the Commonwealth of Massachusetts and the United States in writing, the Fund Amount already collected and all future payments will be divided between the United States and the Commonwealth of Massachusetts with the United States receiving 60% of the Fund Amount and

- 8 -

the Commonwealth of Massachusetts receiving 40% of the Fund Amount, unless otherwise agreed to by the United States Attorney's Office, Federal Highway Administration, and the Commonwealth of Massachusetts in writing. In no way does the failure of the Commonwealth of Massachusetts to successfully create the fund alter any obligation of Aggregate or render this Agreement null and void.

D.      In the event that Aggregate fails to pay any or all of the Settlement Amount pursuant to Paragraph 1 above within thirty days of the due date, any dismissals as to Aggregate shall, at the United States' and the Commonwealth's option, be null and void, the Settlement Amount referenced in Paragraph 1 above (minus any payments made to date) shall become immediately due and payable, and shall bear interest at the rate of 12% compounded annually as of the date of default until payment of the Settlement Amount is made in full, and the United States and the Commonwealth may, at their option, 1) rescind releases (without tendering to Aggregate any portion of the Settlement Amount, if any, already paid by Aggregate), 2) file a Stipulated Judgment against Aggregate, in the amount of $42,720,000 less the amount of payments made by Aggregate under the Settlement Agreement, in the United States District Court for the District of Massachusetts, or 3) re-instate an action or actions against Aggregate in the United States District Court for the District of Massachusetts or in the Massachusetts Superior Court. If the Relators have not received any payment pursuant to paragraphs 1.E. and 1.F. below and the United States or the Commonwealth elects to rescind releases and re-instate an action as set forth in this paragraph, the Relators shall have all the rights they had prior to this Agreement, except the right to contest the amount of or fairness, adequacy or reasonableness of the False Claims Act Settlement Amounts as described herein. Aggregate agrees not to contest

- 9 -

any collection action undertaken by the United States or the Commonwealth pursuant to this Paragraph, either administratively or in any state or federal court. Aggregate agrees to pay the United States and the Commonwealth all reasonable costs of collection and enforcement of this Agreement, including attorney's fees and expenses. Aggregate expressly agrees to waive and not to plead, argue, or otherwise raise any defense under the theories of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims which (a) are filed by the United States or the Commonwealth within 180 calendar days of written notification to Aggregate that this Agreement has been made a nullity, and (b) relates to the Covered Conduct, except to the extent those defense were available on May 3, 2006. In the event Aggregate Northeast Region, Inc. or Aggregate Industries Management, Inc. is sold (substantially all of its assets or stock) at any time before all payments pursuant to this Agreement have been made, Aggregate agrees that the remaining amount due on the Settlement Amount shall be paid on or before the date of the closing of the sale.

    E.    Contingent upon the United States receiving the payment of the Federal Settlement Amounts stated above in paragraph 1.A. from Aggregate, and as soon as feasible after such receipt, the United States agrees to pay the Relators in Paragraphs C and D collectively $1,620,000 by electronic funds transfer and agrees to pay the Relator in Paragraph E $45,000. It is expressly understood and agreed that the United States in no way promises, guarantees, nor is liable to Relators for the failure of Aggregate to make payment of any funds pursuant to this Agreement or for the payment of the Relators' share except for 17.8% of the funds actually collected and received towards the Federal False Claims Settlement Amount.

- 10 -

F.      Contingent upon the Commonwealth of Massachusetts receiving the
payment of the State Settlement Amounts stated above in paragraph 1.B. from Aggregate, and as
soon as feasible after such receipt, the Commonwealth of Massachusetts agrees to pay the
Relators in Paragraphs B and C collectively $1,080,000 by electronic funds transfer and agrees to
pay the Relator in Paragraph E $30,000. It is expressly understood and agreed that the
Commonwealth of Massachusetts in no way promises, guarantees, nor is liable to Relators for
the failure of Aggregate to make payment of any funds pursuant to this Agreement or the
payment of the Relators' share except for 17.8% of the funds actually collected and received
towards the State False Claims Settlement Amount.

2.      If Aggregate's agreed upon guilty plea pursuant to Fed. R. Crim. P. 11(c)(1)(C) in
the Federal Criminal Action described in Paragraph F of the Recitals is not accepted by the Court
or if the Court does not impose the Parties' agreed upon disposition in their Plea Agreement, this
Agreement shall be null and void at the option of either the United States or Aggregate. If either
the United States or Aggregate exercises this option, which option shall be exercised by
notifying all Parties, through counsel, in writing within ten (10) business days of the Court's
decision, the Parties will not object and this Agreement will be rescinded. If this Agreement is
rescinded, Aggregate will not plead, argue, or otherwise raise any defenses under the theories of
statute of limitations, laches, estoppel, or similar theories, to any such civil or administrative
claims, actions or proceedings which are brought by the United States within 90 calendar days of
notification to all other Parties of that rescission, except to the extent such defenses were
available before May 3, 2006.

- 11 -

3.     Subject to paragraph 4 below, upon receipt of full and final payment described in paragraph 1.A and 1.C. above, the United States shall hereby fully and finally release Aggregate Industries Northeast Region, Inc. and Aggregate Industries Management, Inc., their respective corporate heirs successors, assigns, agents, current employees, affiliates and attorneys from all civil monetary claims or causes of action for civil damages and/or civil monetary penalties and costs of investigation under the False Claims Act, 31 U.S.C. §§ 3729 - 3733, and claims under common law for the Covered Conduct, except as described in paragraph 4, below.

4.     By this Agreement, the United States does not release, and specifically reserves the right to assert, the following claims, as to which Aggregate reserves the right to assert all defenses:

(a) Any claims arising under Title 26, U.S. Code (Internal Revenue Code);

(b) Any administrative liability, except as explicitly stated in the agreement between Aggregate and the Federal Highway Administration dated July 26, 2007 (the "FHWA Agreement");

(c) Any civil liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

(d) Any claims based upon such obligations as are created by this Settlement Agreement;

(e) Any claims brought by a third party or parties against the United States (or its agencies) where the United States (or its agencies) would otherwise be permitted to implead Aggregate pursuant to Fed. R. Civ. P. 14(a) or Fed. R. Civ. P. 14(b), or where Aggregate is subject to compulsory joinder pursuant to Fed. R. Civ. P. 19(a);

- 12 -

(f) Any express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services, provided by Aggregate except for the Covered Conduct.

(g) Any civil or administrative claims against individuals, including current or former directors, officers, employees, agents or shareholders of Aggregate, who receive target letters, are indicted, convicted, or who enter into a criminal plea agreement related the Covered Conduct;

(h) Any claims for personal injury;

(i) Any claims for property damage, other than claims for the out-of-specification concrete identified in the Covered Conduct;

(j) Any claims related to bituminous concrete or asphalt, including but not limited to, any claims related to recycled asphalt product ("RAP");

(k) Any claims against any other individuals, contractors, suppliers, Bechtel/Parsons Brinckerhoff, and/or employees or former employees of Aggregate.

(l) Any claims that concrete supplied to the government contained less fly ash than prescribed under the mix design specification or that Aggregate substituted other ingredients, including cement, for prescribed amount of fly ash.

5.      Subject to paragraph 6 below, upon receipt of full payment described in paragraph 1.B. and 1.C. above, the Commonwealth of Massachusetts shall hereby fully and finally release Aggregate Industries Northeast Region, Inc. and Aggregate Industries Management, Inc., their respective corporate heirs successors, assigns, agents, current employees, affiliates and attorneys from any and all civil monetary claims or causes of action it ever had or may have for civil

- 13 -

damages and/or civil monetary penalties and costs of investigation under the G.L. c. 12, §5A, et seq., or the common law theories of payment by mistake, unjust enrichment, breach of contract and fraud for and claims under common law for the Covered Conduct, except as described in paragraph 6, below.

6.     By this Agreement, the Commonwealth of Massachusetts does not release, and specifically reserves the right to assert, the following claims, as to which Aggregate reserve the right to assert all defenses:

(a) Any claims arising under the state tax law;

(b) Any administrative liability, except as explicitly stated in the FHWA Agreement;

(c) Any civil liability to the Commonwealth (or its agencies) for any conduct other than the Covered Conduct;

(d) Any claims based upon such obligations as are created by this Settlement Agreement;

(e) Any claims brought by a third party or parties against the Commonwealth of Massachusetts (or its agencies) where the Commonwealth of Massachusetts (or its agencies) would otherwise be permitted to implead Aggregate pursuant to .Fed. R. Civ. P. 14(a) or Fed. R. Civ. P. 14(b), or where Aggregate is subject to compulsory joinder pursuant to Fed. R. Civ. P. 19(a) (or the corresponding Massachusetts rules);

(f) Any express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services, provided by Aggregate except for the Covered Conduct.

- 14 -

(g) Any civil or administrative claims against individuals, including current or former directors, officers, employees, agents or shareholders of Aggregate, who receive target letters, are indicted, convicted, or who enter into a criminal plea agreement related the Covered Conduct;

(h) Any claims for personal injury;

(i) Any claims for property damage, other than claims for the out-of-specification concrete identified in the Covered Conduct;

(j) Any claims related to bituminous concrete or asphalt, including but not limited to, any claims related to recycled asphalt product ("RAP");

(k) Any claims against any other individuals, contractors, suppliers, Bechtel/Parsons Brinckerhoff, and/or employees or former employees of Aggregate.

(l) Any claims that concrete supplied to the government contained less fly ash than prescribed under the mix design specification or that Aggregate substituted other ingredients, including cement, for prescribed amount of fly ash.

7.      Relators agree that the Federal portion of the settlement of the Civil Actions, as set forth in paragraph 1.A. (which does not include the Fund Amount described in paragraph 1.C.), for $9,343,985.40 is fair, adequate and reasonable under all the circumstances and that they will not challenge the settlement or this Agreement pursuant to 31 U.S.C. § 3730(c)(2)(B), and they expressly waive the opportunity for a hearing on any objection to this Agreement pursuant to 31 U.S.C. § 3730(c)(2)(B). Furthermore, conditioned upon receipt by the Relators of the Relators' shares as set forth in Paragraph 1.E., all Relators, for themselves individually, and for their heirs, successors, agents and assigns, fully and finally release, waive, and forever

- 15 -

discharge the United States, its agencies, employees, servants, and agents from any claims arising from or relating to 31 U.S.C. § 3730, including 31 U.S.C. §§ 3730(b),(c), (c)(5), (d), and (d)(1), from any claims arising from the filing of the Civil Actions, and from any other claims for a share of the Settlement Amount, and in full settlement of any claims Relators may have under this Agreement. This Agreement does not resolve or in any manner affect any claims the United States has or may have against the Relators arising under Title 26, U.S. Code (Internal Revenue Code), or any claims based upon such obligations as are created by this Agreement. The Relators expressly waive any claims to the Federal share of the Fund Amount described in paragraph 1.C. With respect to the Relator identified in paragraph E of the Recitals, this paragraph shall only apply to those claims identified as being dismissed in the Stipulation of Dismissal.

8.     Relators agree that the Commonwealth's portion of the settlement of the Civil Actions for $6,229,323.60 is fair, adequate and reasonable under all the circumstances and that they will not challenge the settlement or this Agreement pursuant to M.G.L. c. 12 §§ 5A-5O, and they expressly waive the opportunity for a hearing on any objection to this Agreement pursuant to M.G.L. c. 12 §§ 5A-5O. Furthermore, conditioned upon receipt by the Relators of the Relators' shares as set forth in Paragraph 1.F., all Relators, for themselves individually, and for their heirs, successors, agents and assigns, fully and finally release, waive, and forever discharge the Commonwealth of Massachusetts, its agencies, employees, servants, offices and agents from any claims arising from or relating to M.G.L. c. 12 §§ 5A-5O, from any claims arising from the filing of the Civil Action, and from any other claims for a share of the Settlement Amount, and in full settlement of any claims Relators may have under this Agreement. This Agreement does not

- 16 -

resolve or in any manner affect any claims the Commonwealth of Massachusetts has or may have against the Relators arising under the state tax code, or any claims based upon such obligations as are created by this Agreement. The Relators expressly waive any claims to the Commonwealth of Massachusetts' share of the Fund Amount described in paragraph 1.C. With respect to the Relator identified in paragraph E of the Recitals, this paragraph shall only apply to those claims identified in the Stipulation of Dismissal.

9.      In consideration of the obligations of the United States and Commonwealth of Massachusetts set forth in this Agreement, Aggregate and its predecessors, subsidiaries, corporate parents and affiliates fully and finally releases the United States and the Commonwealth of Massachusetts, their agencies, employees, servants, offices and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) which they have asserted, could have asserted, or may assert in the future against the United States or the Commonwealth of Massachusetts, their agencies, employees, servants, and agents, related to or arising from the investigation and prosecution of the civil actions identified in Paragraphs B through E of the Recitals to this Agreement, the Federal Criminal Action, and the Covered Conduct.

10.      Within seven (7) business days after the first payment of the Federal and State False Claims Settlement Amount pursuant to this Agreement, the United States, the Commonwealth of Massachusetts and the Relators will file stipulations of dismissals with prejudice, subject to paragraph 1.D above, as to Aggregate in the civil actions identified in Paragraphs B through E of the Recitals to this Agreement in the form of the stipulations of dismissal attached hereto as Attachments 1, 2, 3 and 4. With respect to the Relator in Paragraph

- 17 -

E of the Recitals, the stipulation of dismissal will be limited to those claims concerning the Covered Conduct.

11. In consideration of the obligations of Aggregate set forth in this Agreement, the Relators, for themselves, and for their heirs, successors, attorneys, agents, and assigns, hereby fully and finally release Aggregate and their predecessors, subsidiaries, corporate parents and affiliates, successors and assigns and their current and former directors, officers, employees and attorneys from any claims or allegations which the Relators have asserted, could have asserted, or may assert in the future against any of them, whether or not related to or arising from the government's investigation and prosecution of the qui tam actions, the Federal Criminal Action and the Covered Conduct, including without limitation, claims relating to or arising under the False Claims Act, 31 U.S.C. §§ 3729-3733, M.G.L. c. 12 §§ 5A-5O, and common law, except any claims for reasonable expenses and reasonable attorney's fees and costs pursuant to 31 U.S.C. § 3730(d) or M.G.L. c. 12, § 5F, and any claims arising after the date of this Agreement. Provided however, with respect to the Relator described in Paragraph E of the Recitals, this release is limited only to those claims dismissed in the Stipulation of Dismissal (Attachment 4).

12. In consideration of the obligations of the Relators set forth in this Agreement, Aggregate, and its predecessors, subsidiaries, corporate parents and affiliates, and all of its agents, successors and assigns, hereby fully and finally release the Relators and its respective heirs, successors, assigns, agents, and attorneys from any claims they have asserted, could have asserted, or may assert in the future against any of the Relators whether or not relating to the *qui tam* actions.

- 18 -

13.     Aggregate waives and will not assert any defenses Aggregate may have to any criminal prosecution or administrative action relating to the Covered Conduct, which defenses may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action. Nothing in this Agreement constitutes an agreement by the Government concerning the characterization of the amounts paid hereunder for purposes of any proceeding under Title 26 of the Internal Revenue Code or the tax laws of the Commonwealth of Massachusetts.

14.     A.     It is agreed that all costs (as defined in Federal Acquisition Regulation 48 § 31.205-47) incurred by or on behalf of Aggregate and its officers, directors, agents and employees in connection with (1) the Government's investigation of the matters covered by this Settlement Agreement and the related Plea Agreement; (2) Aggregate's investigation and defense of the matters covered by this Settlement Agreement, and any corrective action undertaken in direct response to the Government's investigation of the matters covered by this Settlement Agreement; (3) the negotiation of this Agreement; (4) the payments made to the Government pursuant to this Agreement; (5) any payments that Aggregate may make to Relators; and (6) the negotiation of, and the obligations undertaken pursuant to the FHWA Agreement shall be unallowable costs for state and federal government contract accounting purposes. These amounts shall be separately accounted for by Aggregate.

        B.     Future Treatment of Unallowable Costs: If applicable, these unallowable costs will be separately estimated and accounted for by Aggregate, and they will not charge such

- 19 -

unallowable costs directly or indirectly to any contracts with the United States or the Commonwealth of Massachusetts, or seek payment for such unallowable costs through any cost report, cost statement, information statement, or payment request submitted by them or any of their subsidiaries to the Government.

           C.      Treatment of Unallowable Costs Previously Submitted for Payment: If applicable, Aggregate further agrees that within 60 days of the effective date of this Agreement, it will identify to the United States and the Commonwealth of Massachusetts any unallowable costs (as defined in this Paragraph) included in payments previously sought in any payment requests already submitted by Aggregate or its officers, directors, agents and employees and will request, and agree, that such payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the unallowable costs. Aggregate agrees that the United States and the Commonwealth of Massachusetts, at a minimum, will be entitled to recoup from Aggregate any overpayment plus applicable interest as a result of the inclusion of such unallowable costs on previously-submitted requests for payment. Any payment due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice, and/or the affected agencies. Any payment due after the adjustments have been made shall be paid to the Commonwealth of Massachusetts pursuant to the direction of the Attorney General's Office, and/or the affected agencies. The United States and the Commonwealth of Massachusetts reserve their rights to disagree with any calculations submitted by Aggregate on the effect of inclusion of unallowable costs (as defined in this Paragraph) on Aggregate's cost reports, cost statements, or information reports. Nothing in this Agreement shall constitute a

- 20 -

waiver of the rights of the United States to examine or reexamine the unallowable costs described in this Paragraph.

15.    Aggregate expressly warrants that it has reviewed its financial situation and that it is currently solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I), and will remain solvent during the Payment Period. Further, the Parties expressly warrant that, in evaluating whether to execute this Agreement, the Parties (a) have intended that the mutual promises, covenants and obligations set forth herein constitute a contemporaneous exchange for new value given to Aggregate, within the meaning of 11 U.S.C. § 547(c)(1), and (b) have concluded that these mutual promises, covenants and obligations do, in fact, constitute such a contemporaneous exchange.

16.    In the event that Aggregate commences, or another party commences, within the Payment Period, any case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors, (a) seeking to have any order for relief of Aggregate's debts, or seeking to adjudicate Aggregate as bankrupt or insolvent, or (b) seeking appointment of a receiver, trustee, custodian or other similar officials for Aggregate or for all or any substantial part of their assets, Aggregate agrees that:

A.    Aggregate's obligations under this Agreement may not be avoided pursuant to 11 U.S.C. § 547 or 548, and Aggregate will not argue or otherwise take the position in any such case, proceeding or action that: (I) Aggregate's obligations under this Agreement may be avoided under 11 U.S.C. § 547 or 548; (ii) Aggregate was insolvent at the time this Agreement was entered into, or became insolvent as a result of the payments made to the United States or the Commonwealth of Massachusetts hereunder; or (iii) the mutual promises, covenants

- 21 -

and obligations set forth in this Agreement do not constitute a contemporaneous exchange for
new value given to Aggregate;

B.  In the event that Aggregate's obligations hereunder are avoided for any
reason, including, but not limited to, the exercise of a trustee's avoidance powers under the
Bankruptcy Code, the United States or the Commonwealth of Massachusetts, at their sole
discretion, may rescind the release in this Agreement, and bring any civil and/or administrative
claim, action or proceeding against Aggregate for the claims that would otherwise be covered by
the releases provided in this Agreement. If the United States or the Commonwealth of
Massachusetts chooses to do so, Aggregate agrees that, for purposes only of any case, action, or
proceeding referenced in the first clause of this Paragraph, (I) any such claims, actions, or
proceedings brought by the United States or the Commonwealth of Massachusetts are not subject
to an "automatic stay" pursuant to 11 U.S.C. § 362(a) as a result of the action, case or proceeding
described in the first clause of this Paragraph, and that Aggregate will not argue or otherwise
contend that the United States' or Commonwealth of Massachusetts' claims, actions or
proceedings are subject to an automatic stay; (ii) that Aggregate will not plead, argue or
otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or
similar theories, to any such civil or administrative claims, actions or proceedings which are
brought by the United States within 90 calendar days of written notification to Aggregate that the
release herein have been rescinded pursuant to this Paragraph, except to the extent such defenses
were available before May 3, 2006; and (iii) the United States and the Commonwealth have valid
claims against Aggregate in the aggregate amount of $42,720,000, and they may pursue their

- 22 -

claims, *inter alia*, in the case, action, or proceeding referenced in the first clause of this Paragraph, as well as in any other case, action, or proceeding; and

   C. Aggregate acknowledges that its agreements in this Paragraph are provided in exchange for valuable consideration provided in this Agreement.

   17. In no event are the terms of this Settlement Agreement intended to, nor are they to be construed to, work a release of liability or in any way create a benefit in favor of any person not a party to this Settlement Agreement.

   18. This Settlement Agreement cannot be introduced into evidence in any proceeding except by the parties, subject to available objections.

   19. Each party will bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement, except nothing in this Paragraph will affect the Relators' right to recover attorney's fees and costs from Aggregate.

   20. Aggregate has entered into an agreement with the Department of Transportation, attached as Attachment 5 ("Settlement Agreement between FHWA and Aggregate Industries Northeast, Inc. and Aggregate Industries Management, Inc."), which is incorporated into this Agreement by reference. Aggregate will immediately upon execution of this Agreement begin to implement their obligations under Attachment 5. Failure to comply with the FHWA Agreement will constitute breach of this Agreement.

   21. Aggregate shall cooperate completely and truthfully in any trial or other proceeding arising out of any ongoing federal investigation of its current and former officers, directors, employees and agents. Aggregate shall make all reasonable efforts to facilitate access to, and to encourage the cooperation of, its current and former officers, directors, employees and

- 23 -

agents for interviews and testimony sought by the United States, upon request and reasonable notice. Provided, however, notwithstanding any provision of this agreement, that: (1) neither Aggregate Industries Northeast Region nor Aggregate Industries Management, Inc. is required to request of its respective current or former officers, agents, or employees that they forgo seeking the advice of an attorney nor that they act contrary to that advice; and (2) neither Aggregate Industries Northeast Region nor Aggregate Industries Management, Inc. is required to take any action against its officers, agents, or employees for following their attorney's advice. In addition, Aggregate shall furnish to the United States or the Commonwealth of Massachusetts, upon request, all documents and records in its possession, custody or control relating to the conduct that is within the scope of any ongoing federal or state investigation, trial or other proceeding arising out of the delivery of any Aggregate product or service to the federal or state government. Aggregate specifically agrees to waive any attorney-client privilege or claim of work product protection regarding conduct for which claims of an advice of counsel defense or claims of good faith defense based upon attorney advice are made by current or former officers, directors, employees and agents of Aggregate with respect to the Covered Conduct in any ongoing federal or state investigation or trial in which the United States or the Commonwealth is the plaintiff.

22. This Agreement and Attachments 1 through 4 attached hereto, together with FHWA Agreement, which is Attachment 5, incorporated by reference, the Plea Agreement described in Recitals Paragraph F, and the Information charging Aggregate Industries Northeast Region with violating Title 18, United States Code, Section 286 constitute the complete agreement between the Parties.

- 24 -

23.     The provisions of this Settlement Agreement shall be binding upon the Parties to
it, their affiliated entities, and their collective successors and assigns.

24.     All Parties consent to the public disclosure of this Settlement Agreement.

25.     This Settlement Agreement may not be amended except by written consent of the
Parties.

26.     Each person who signs this Agreement in a representative capacity warrants that
he or she is duly authorized to do so. The undersigned Aggregate signatories represent and
warrant that they are authorized by their Board of Directors to execute this Agreement. The
undersigned signatory or signatories for each Relator represent and warrant that they are
authorized to execute this Agreement on behalf of that Relators.

27.     This Settlement Agreement may be executed in counterparts, each of which
constitutes an original and all of which constitute one and the same agreement.

28.     This Agreement is effective on the date of the signature of the last signatory to the
Agreement (the "Effective Date"). Facsimiles of signatures shall constitute acceptable binding
signatures for purposes of this Agreement.

        IN WITNESS WHEREOF, the parties hereto affix their

signatures.

MICHAEL J. SULLIVAN                         MARTHA COAKLEY
United States Attorney                      Attorney General for the Commonwealth of
                                            Massachusetts

By:    Jeffrey M. Cohen                     By:    Edward Bedrosian
       Assistant United States Attorney            Deputy First Assistant Attorney General

Dated: 7-27-07                              Dated: 7-27-07

- 25 -

AGGREGATE INDUSTRIES NORTHEAST    AGGREGATE INDUSTRIES
REGION, INC.                       MANAGEMENT, INC.


By:    Roberto Huet                By:    Louis Beauchemin
       President                          President

Dated: 7/26/07                     Dated: 7/26/07


R. ROBERT POPEO, ESQ.


Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
Counsel for Aggregate Industries Northeast Region, Inc. and
Aggregate Industries, Inc.

Dated: 7/26/07


TIMOTHY CHASE, JR                  ANDREW RAINER, ESQ.


_____             _____
Relator                            Counsel for Timothy Chase, Jr.

Dated: _____             Dated: _____

DONALD E. FINNEY                   JOSEPH HARRINGTON


_____             _____
Relator                            Relator
Dated: _____

                                   Dated: _____

- 25 -

AGGREGATE INDUSTRIES NORTHEAST    AGGREGATE INDUSTRIES
REGION, INC.                      MANAGEMENT, INC.


By:    Roberto Huet                  By:    Louis Beauchemin
       President                            President


Dated: _____                Dated: _____


R. ROBERT POPEO, ESQ.


_____

Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
Counsel for Aggregate Industries Northeast Region, Inc. and
Aggregate Industries, Inc.

Dated: _____


TIMOTHY CHASE, JR.                   ANDREW RAINER, ESQ.


Relator                              Counsel for Timothy Chase, Jr.

Dated: ___7/26/07___                 Dated: ___7/26/07___


DONALD E. FINNEY                     JOSEPH HARRINGTON


Relator                              Relator

Dated: 7-26-07                       Dated: 7-27-07

- 26 -

SUSAN MCNEIL, ESQ.

Counsel for Donald Finney and Joseph Harrington

Dated: 7-26-07

DANIEL JOHNSTON

Relator

Dated:

SUZANNE DURRELL, ESQ.

Counsel for Daniel Johnston

Dated: 7/26/07

# Attachment 1

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES ex rel TIMOTHY R. CHASE, JR., | ) ) ) |
| Plaintiffs, | ) Civil Action No. 05-11586-GAO |
|  | ) |
| v. | ) **FILED UNDER SEAL** |
|  | ) |
| AGGREGATE INDUSTRIES, INC., a subsidiary of HOLCIM LTD., | ) ) ) |
|  | ) |
| Defendant. | ) ) |

## STIPULATED MOTION FOR DISMISSAL OF ACTION WITH PREJUDICE PURSUANT TO FED. R. CIV. P. 41(a)(1)(ii)

Pursuant to Fed. R. Civ. P. 41(a)(1)(ii) and pursuant to and consistent with the Civil

Settlement Agreement signed on July 26, 2007, the United States of America, relator Timothy

Chase, Jr. and the defendant Aggregate Industries, Inc. (collectively, the "Parties"), hereby

stipulate to the dismissal, with prejudice, of the claims against the defendant in the

above-captioned action.

//

//

//

//

//

//

//

//

The United States and the defendant agree that each will bear its own costs, expenses and attorneys' fees. The Relator and the defendant have not reached an agreement on costs, expenses and attorney's fees. The Relator requests that the Court retain jurisdiction over the case to adjudicate the Relator's claims against the defendant for reimbursement of costs, expenses, and attorneys' fees pursuant to 31 U.S.C. § 3730(d).

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    Jeffrey M. Cohen
       Assistant United States Attorney

Dated:_____

R. ROBERT POPEO, ESQ.

Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
Counsel for Aggregate Industries, Inc.

Dated: _____

ANDREW RAINER, ESQ.

Counsel for Timothy Chase, Jr.

Dated: _____

# Attachment 2

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA and COMMONWEALTH OF MASSACHUSETTS ex rel. JOSEPH HARRINGTON and DONALD E. FINNEY,         Plaintiffs, <br><br> v. <br><br> AGGREGATE INDUSTRIES, INC., f/k/a BARDON GROUP, INC., AGGREGATE INDUSTRIES-NORTHEAST REGION, INC., f/k/a BARDON TRIMOUNT, INC., f/k/a SIMEON CORPORATION, f/k/a J.H. MCNAMARA INCORPORATED, F/K/A AS&G CORPORATION f/k/a LRM CONCRETE, CORP., f/k/a COAST CONCRETE CO., INC., f/k/a ESSEX BITUMINOUS CORP., f/k/a T & T LEASING CORP., f/k/a G & F LEASING CORP., f/k/a BNT SAND AND GRAVEL CO., INC., f/k/a CONCRETE SERVICES INC., f/k/a HOT-TOP PAVEMENTS INCORPORATED, f/k/a NEEDHAM SAND AND GRAVEL COMPANY, MIDDLESEX MATERIALS, INC., f/k/a AGGREGATE INDUSTRIES ACQUISITI, f/k/a BARDON TRIMOUNT, INC., f/k/a SIMEON CORPORATION, f/k/a MIDDLESEX MATERIALS, LLC, f/k/a MIDDLESEX PAVING CORP., f/k/a HIGHWAY PAVING INC., f/k/a SAROA BROS., INC., and BARDON TRIMOUNT, INC., f/k/a A S & g CORPORATION f/k/a LRM CONCRETE, CORP., f/k/a COAST CONCRETE CO., INC., f/k/a ESSEX BITUMINOUS CORP., f/k/a T & T LEASING CORP., f/k/a G & f LEASING CORP., f/k/a B N T SAND AND GRAVEL CO., INC. f/k/a CONCRETE SERVICES, INC., f/k/a J.H. MCNAMARA INCORPORATED. <br><br>         Defendants. | ) ) ) ) ) ) ) Civil Action No. 05-11364-WGY ) ) ) **FILED IN CAMERA AND** ) **UNDER SEAL** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## STIPULATED MOTION FOR DISMISSAL OF ACTION
## PURSUANT TO FED. R. CIV. P. 41(a)(1)(ii)

Pursuant to Fed. R. Civ. P. 41(a)(1)(ii) and pursuant to and consistent with the Civil

Settlement Agreement signed on July 26, 2007, relators Joseph Harrington and Donald Finney

(the Relators), the Defendants, together with the United States, and the Commonwealth of Massachusetts, hereby stipulate that all claims against the Defendants in this matter are dismissed with prejudice as to the relators Joseph Harrington and Donald Finney. The United States and the Commonwealth of Massachusetts stipulate to the dismissal with prejudice of all claims described in the Covered Conduct in the Settlement Agreement (Exhibit # 1). The United States and the Commonwealth stipulate to the dismissal, without prejudice, of all other claims in the above-captioned case.

The United States, the Commonwealth of Massachusetts, and the Defendants agree that each will bear its own costs, expenses and attorneys' fees. The Relators and the Defendants have not reached an agreement on costs, expenses and attorney's fees. The Relators request that the Court retain jurisdiction over the case to adjudicate the Relators' claims against the Defendants for reimbursement of costs, expenses, and attorneys' fees.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

Dated: _____

By:   Jeffrey M. Cohen
      Assistant United States Attorney

MARTHA COAKLEY
Attorney General for the Commonwealth of Massachusetts

Dated: _____

By:   Edward Bedrosian
      Deputy First Assistant Attorney General

Dated: _____          R. ROBERT POPEO, ESQ.

_____

Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
Counsel for Aggregate Industries, Inc. and Aggregate
Industries NE Region, Inc.

Dated: _____          SUSAN MCNEIL, ESQ.

_____

Counsel for Donald Finney and Joseph Harrington

# Attachment 3

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES and the <br> COMMONWEALTH OF <br> MASSACHUSETTS ex rel. DANIEL E. <br> JOHNSTON, <br><br>       Plaintiffs, <br><br> v. <br><br> AGGREGATE INDUSTRIES PLC, <br> AGGREGATE INDUSTRIES <br> MANAGEMENT, INC., AGGREGATE <br> INDUSTRIES NE, INC., et al. <br><br>       Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 06-11379-GAO <br> ) <br> ) **FILED UNDER SEAL** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## STIPULATED MOTION FOR PARTIAL DISMISSAL OF ACTION WITH PREJUDICE PURSUANT TO FED. R. CIV. P. 41(a)(1)(ii)

Pursuant to Fed. R. Civ. P. 41(a)(1)(ii) and pursuant to and consistent with the Civil Settlement Agreement signed on July 25, 2007 (the "Agreement"), the United States of America, the Commonwealth of Massachusetts, relator Dan Johnston, and the defendants Aggregate Industries PLC, Aggregate Industries Management, Inc., and Aggregate Industries NE, Inc. (collectively referred to herein as "the Aggregate Defendants" or "Aggregate"), hereby stipulate that certain claims against the Aggregate Defendants, in this action shall be dismissed with prejudice, specifically those claims which allege that the Aggregate Defendants violated the Federal and/or Massachusetts False Claims Acts by supplying "10-9" concrete (over 90 minutes old and/or leftover) concrete to the Big Dig. Those claims are described more fully as the "Covered Conduct" in the Settlement Agreement:

      [F]rom as early as approximately October 1996, Aggregate conspired to sell to

general contractors on the Big Dig approximately 5,700 loads of out of specification redi-mix concrete as described below (hereinafter referred to as "the Covered Conduct"). The 5,700 loads were non-conforming loads either because they contained a full load of non-conforming concrete that was represented to the Big Dig inspectors as conforming or because the load was partially conforming and was mixed with a partial load of non-conforming concrete. As part of Aggregate's scheme, Aggregate mixed concrete left over from other jobs with fresh concrete and delivered this mixture of old and new concrete to contractors on the Big Dig. Additionally, Aggregate rerouted concrete that had already been rejected by Big Dig inspectors back to different locations at the Big Dig project. In order to deceive Big Dig inspectors and conceal the scheme, Aggregate often added extra water to loads to make the concrete appear freshly batched or add fresh concrete to a partial non-conforming load. To further conceal the scheme and deceive inspectors, Aggregate generated false records that stated that the out-of-specification concrete was actually within specification. Specifically, the false records misstated the mix of concrete and the time the concrete was batched;

No other claims against the Aggregate Defendants are hereby dismissed, including

without limitation, any claim for concrete loads not described above, and any claim for attorneys'

fees and costs. Nor are any claims against any other Defendant(s) other than the Aggregate

Defendants in this action hereby dismissed or otherwise compromised.

The United States, the Commonwealth of Massachusetts, and the Aggregate Defendants

agree that each will bear its own costs, expenses and attorneys' fees. The relator and the

Aggregate Defendants have not reached an agreement on costs, expenses and attorney's fees with

respect to those claims dismissed by the Settlement Agreement. The Relator requests that the

Court retain jurisdiction over the case to adjudicate the Relator's claims against the Aggregate

Defendants for reimbursement of costs, expenses, and attorneys' fees.

Respectfully Submitted,

MICHAEL J. SULLIVAN
United States Attorney

Dated:_____    By:    Jeffrey M. Cohen

Assistant United States
Attorney

MARTHA COAKLEY
Attorney General for the Commonwealth of Massachusetts

By:   Edward Bedrosian
      Deputy First Assistant Attorney General

R. ROBERT POPEO, ESQ.

Dated: _____

Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
Counsel for Aggregate Industries Northeast Region, Inc.
and Aggregate Industries, Inc.

Dated: _____

SUZANNE DURRELL, ESQ.

Dated: _____

Counsel for Daniel Johnston

# Attachment 4

## COMMONWEALTH OF MASSACHUSETTS

**SUFFOLK, SS.**                                          **SUPERIOR COURT**

UNITED STATES ex rel TIMOTHY R. )
                 CHASE, JR.,              )
                                          )
           Plaintiffs,                    ) Civil Action No. 05-1936
                                          )
    v.                                    ) **FILED UNDER SEAL**
                                          )
AGGREGATE INDUSTRIES, INC., a             )
subsidiary of HOLCIM LTD.,                )
                                          )
           Defendant.                     )
                                          )

## STIPULATED MOTION FOR DISMISSAL OF ACTION WITH PREJUDICE PURSUANT TO MASS. R. CIV. P. 41(a)(1)(ii)

Pursuant to Mass. R. Civ. P. 41(a)(1)(ii) and pursuant to and consistent with the Civil

Settlement Agreement signed on July 26, 2007, the Commonwealth of Massachusetts, relator

Timothy Chase, Jr. and the defendant Aggregate Industries, Inc. (collectively, the "Parties"),

hereby stipulate to the dismissal, with prejudice, of the claims against the defendant in the above-

captioned action.

//

//

//

//

//

//

//

//

The Commonwealth and the defendant agree that each will bear its own costs, expenses and attorneys' fees. The Relator and the defendant have not reached an agreement on costs, expenses and attorney's fees. The Relator requests that the Court retain jurisdiction over the case to adjudicate the Relator's claims against the defendant for reimbursement of costs, expenses, and attorneys' fees.

Respectfully submitted,

MARTHA COAKLEY
Attorney General

Dated:_____

By:    Edward Bedrosian
       Deputy First Assistant Attorney General

R. ROBERT POPEO, ESQ.

Dated:_____

Mintz Levin Cohn Ferris Glovsky and Popeo, P.C.
Counsel for Aggregate Industries, Inc.

ANDREW RAINER, ESQ.

Counsel for Timothy Chase, Jr.

Dated:_____

# Attachment 5

**SETTLEMENT AGREEMENT (the "AGREEMENT") BETWEEN THE
FEDERAL HIGHWAY ADMINISTRATION ("FHWA"),
AGGREGATE INDUSTRIES NORTHEAST REGION, INC. ("AI NE"), AND
AGGREGATE INDUSTRIES MANAGEMENT, INC. ("AI")**

WHEREAS, on October 3, 2003, the FHWA suspended AI NE based on the indictment of two employees, a senior vice president and a general manager, for mail fraud and witness tampering;

WHEREAS, on December 24, 2003, AI NE, through its counsel, accepted the terms and conditions established in the FHWA's December 23, 2003 letter settling AI NE's October 3, 2003 suspension;

WHEREAS, the FHWA, in a December 23, 2003 letter, provided that AI NE would voluntarily exclude itself from participating in covered transactions for the duration of its criminal proceedings in the event that AI NE was indicted for an offense listed at 49 C.F.R. 29.800 and would voluntarily exclude itself from participating in covered transactions for a period of three years in the event that the FHWA debarring officials found that AI NE, or any of its principals, had committed any action that would constitute a cause for debarment under 49 C.F.R. 29.800;

WHEREAS, on January 12, 2004, the FHWA and AI NE entered into an agreement (the "Voluntary Exclusion Agreement") in which the FHWA terminated the October 3, 2003 suspension and AI NE agreed to comply with certain terms and conditions, including the hiring of an independent monitor reporting to FHWA and all other terms and conditions contained in the FHWA's December 23, 2003 letter;

WHEREAS, on October 3, 2006, the Voluntary Exclusion Agreement expired, but AI NE voluntarily agreed to extend the term of the existing independent monitor reporting to FHWA until the signing of this Agreement;

WHEREAS, on July 26, 2007, AI NE entered into a plea agreement with the United States Attorney's Office for the District of Massachusetts ("USAO") in which AI NE agreed to plead guilty to one count of conspiracy to defraud the United States with respect to claims in violation of 18 U.S.C. 286 (the "July 26, 2007 Plea Agreement");

WHEREAS, the conduct to which AI NE pled guilty in the July 26, 2007 Plea Agreement involved a scheme to deliver non-compliant concrete to federal and state highway projects ("AI NE Plea"), including approximately 5,700 loads of such concrete to the Central Artery/Tunnel ("CA/T") project, and resolved all potential criminal liability that may have resulted from the government's investigation into AI NE's alleged participation in a scheme to rig bids on several municipal paving contracts between 1996 and 2004, predatory and anti-competitive practices in the asphalt/paving industry in Massachusetts and New Hampshire between 1996 and 2005, and any other alleged

conduct of AI NE known to the U.S Attorney at the time of the signing of the July 26, 2007 Plea Agreement ("AI NE Alleged Activities");

WHEREAS, AI NE is one of seven wholly owned subsidiaries of AI, which is located in Rockville, Maryland and has operational oversight over each of its subsidiaries, including AI NE;

WHEREAS, the July 26, 2007 Plea Agreement would constitute cause to debar AI NE under 49 C.F.R. 29.800;

WHEREAS, the July 26, 2007 Plea Agreement is contingent on the FHWA's agreement not to suspend or debar AI NE;

WHEREAS, 49 C.F.R. 29.635 permits the FHWA to settle a debarment or suspension at any time if it is in the best interests of the Federal Government;

WHEREAS, the FHWA has determined, based on the terms and conditions contained in the July 26, 2007 Plea Agreement and in accordance with the terms and conditions of this Agreement that it is in the best interests of the Federal Government to settle AI NE's debarment that would result from the July 26, 2007 Plea Agreement;

NOW THEREFORE, the FHWA, AI NE, and AI hereby agree as follows:

## PART 1. DEFINITIONS

1.1.1   *Covered Transaction* means any transaction described in 49 C.F.R. Part 29, Subpart B, as amended.

1.1.2   *Debar, Suspend, and Voluntary Exclusion* shall have the same meanings as provided in 49 C.F.R. Part 29.

1.1.3   *Designee* means any government agency designated by the FHWA, which may include, but not be limited to, the Massachusetts Highway Department, Massachusetts Turnpike Authority, and other DOT agencies.

1.1.4   *DOT* means the United States Department of Transportation.

1.1.5   *Monitor* means the person or entity, or group of persons or entities, selected by the FHWA to perform the duties described in this Agreement.

1.1.6   *Monitoring Agencies* means the FHWA, USAO, Office of Inspector General of the DOT, and the Massachusetts Attorney General's Office.

1.1.7   *Concrete* means ready-mix concrete.

## PART 2. SUSPENSION, DEBARMENT, and VOLUNTARY EXCLUSION

### 2.1    Agreement Not to Suspend or Debar AI NE

2.1.1    The FHWA agrees not to suspend or debar AI NE based solely on AI NE's execution of the July 26, 2007 Plea Agreement or the Civil Settlement Agreement between AI NE and the United States and the Commonwealth of Massachusetts, dated July 26, 2007, except as may be provided for in this Agreement. The scope of the FHWA's release concerning suspension or debarment is determined in Part 3 of this Agreement.

### 2.2    Voluntary Exclusion of AI NE

2.2.1    For a period of five (5) years from the date of execution of this Agreement, AI NE will agree to an automatic four (4) year debarment should AI NE, or any of its directors or officers (in conduct relating to AI NE), be convicted of, or receive a civil judgment in an action brought by the United States for, any activity listed at 49 C.F.R. 29.800(a) or should AI NE violate the terms of either this Agreement or the July 26, 2007 Plea Agreement.

### 2.3    Voluntary Exclusion of AI

2.3.1    For a period of five (5) years from the date of execution of this Agreement, AI will agree to an automatic suspension should AI, or any of its directors or officers (in conduct relating to AI), be indicted for any activity listed at 49 C.F.R. 29.800(a), and an automatic three (3) year debarment should AI, or any its directors or officers (in conduct relating to AI), be convicted of, or receive a civil judgment in an action brought by the United States for, any activity listed at 49 C.F.R. 29.800(a).

## PART 3. RELEASE

### 3.1    Scope of Release of AI NE and AI

3.1.1    In this Agreement, DOT and FHWA release AI NE and AI from all administrative liability arising from 5,700 "10/9 loads" (defined below) of concrete delivered by AI NE to the CA/T project.

3.1.2   For purposes of this Agreement, a 10/9 load of concrete shall mean: (1) concrete loads that did not meet CA/T project specifications as a result of concrete being more than 90 minutes old from the time it was batched to the time it was delivered to the CA/T project, exclusive of Known Post-90-Minute Concrete Loads (defined below in Section 3.1.3(b)) and Water/Chemical Added Loads (defined below in Section 3.1.3(b)); and (2) concrete loads that included a mixture of concrete that met CA/T project specifications with non-conforming concrete that was leftover from the same CA/T project, another CA/T project, or a non-CA/T project, exclusive of Known Post-90-Minute Concrete Loads and Water/Chemical Added Loads.

3.1.3   (a) The FHWA may not seek to suspend or debar AI NE for any non-conformance with specifications in the 5,700 10-9 loads. However, outside of those 5,700 loads, the FHWA may seek further suspension or debarment against AI NE should the FHWA determine, by a preponderance of the evidence for a debarment or adequate evidence for a suspension, that concrete delivered to the CA/T by AI NE lacked the specified materials, consisted of unapproved material, or consisted of unapproved proportions of materials, including cement, cementitious materials (fly ash, slag, or microsilica), aggregate (fine and course), chemical additives, or any other materials, except where such non-conformance was de minimis.

(b) FHWA and AI NE agree that suspension or debarment may not be imposed solely based on the delivery of any loads of AI NE concrete that AI NE can demonstrate by a preponderance of the evidence that the Massachusetts Turnpike Authority or its predecessor agencies (together, "MTA") or any of its representatives (including, without limitation, inspectors, project managers, general contractors, or subcontractors to whom AI NE was a supplier) authorized or accepted for delivery to the CA/T, if the MTA or any such representative had actual knowledge that (1) the loads were outside of the CA/T time specification as a result of the concrete being more than 90 minutes old from the time it was batched to the time it was delivered to the CA/T project ("Known Post-90-Minute Concrete Loads") or (2) that water or chemicals were added to the concrete beyond the mix design specifications that disguised the fact that the concrete loads did not meet design specifications ("Water/Chemical Added Loads"). Nothing in this subparagraph (b) shall apply to any deficiencies in the concrete other than those outlined in the previous sentence, nor shall authorization or acceptance include authorization or acceptance obtained by AI NE as the result of collusion, misrepresentation, or fraud by AI NE or any of its employees.

(c) Nothing in this Agreement shall limit any of the defenses that AI NE may have with respect to such suspension or debarment.

3.1.4   There shall be no presumption that any defect discovered in AI NE concrete was caused by, or is attributable to a failure in responsibility by, AI NE, and any such causation and responsibility shall be affixed to AI NE only by a preponderance of the evidence.

3.1.5   It is not the intent of the parties to treat de minimis errors in the batching or delivery of concrete occurring in the ordinary scope of the work as a basis for FHWA action (including, without limitation, debarment or suspension proceedings) against AI NE.

3.1.6   The FHWA agrees that AI NE shall not be subject to any administrative liability (including, without limitation, suspension and debarment) for delivering concrete to the CA/T project that was permitted under CA/T project specifications that were in place at the time the concrete was delivered.

## PART 4. AI OVERSIGHT OBLIGATION

### 4.1    AI Oversight of AI NE

4.1.1   If the FHWA determines that there is a demonstrable failure by AI to properly oversee AI NE's compliance with applicable laws and regulations resulting from AI's

> (1)   failing to follow established internal controls and related compliance procedures;
>
> (2)   failing to develop, implement or enforce an adequate Corporate Integrity Program;
>
> (3)   failing to ensure that AI NE has developed an adequate Corporate Integrity Program; or
>
> (4)   failing to reasonably audit AI NE's compliance with the Corporate Integrity Program and related compliance policies,

then, FHWA may, subject to the provisions of this section, initiate suspension or debarment proceedings against AI pursuant to 49 C.F.R. Part 29. The commission of an offense by AI NE, or any of AI NE's officers or management employees (in conduct relating to AI NE), of any activity listed at 49 C.F.R. 29.800(a) may be evidence of, but not conclusive proof of, a failure by AI of its oversight responsibilities. AI will report to the FHWA any known non-compliance issues with respect to AI NE and describe AI's remedial actions addressing the issue. Should FHWA fail to agree with the adequacy of the remedial actions AI proposes to take, AI agrees to engage in good faith discussions with FHWA to identify mutually agreeable remedial actions. If, after discussing AI's remedial actions, the FHWA determines that AI has not taken adequate remedial actions, then the FHWA may initiate suspension or debarment proceedings against AI pursuant 49 C.F.R. Part 29, and AI shall retain all of its defenses in such proceedings.

### 4.2    Meeting with FHWA Administrator

4.2.1    Within sixty (60) days after the execution of this Agreement, the chief executive and the corporate compliance officer of AI shall meet with the FHWA Administrator to provide an assurance that it intends to exercise adequate control over the operations of its subsidiaries, including AI NE, to ensure that its subsidiaries will not defraud the Government and will operate in compliance with the law.

### 4.3    AI Implementation of July 26, 2007 Plea Agreement

4.3.1    All terms of the July 26, 2007 Plea Agreement shall be accepted and implemented by AI as well as by AI NE.

## PART 5. INSURANCE OBLIGATION

### 5.1    AI NE Liability Insurance

5.1.1    It is agreed that, for a period of thirty (30) years from the date of execution of this Agreement, AI NE will maintain commercial general liability insurance coverage and/or other available liability coverage, with annual limits of not less than $75 million, to cover any future AI NE liability for damages arising out of any Major Structural Concrete Flaw caused primarily by AI NE's failure to comply with the applicable CA/T project mix design specification, where such non-conformance was not de minimis.

5.1.2    For purposes of this Agreement, this insurance liability coverage would apply only to the extent the funds deposited by AI NE in the CA/T maintenance trust account specified in the July 26, 2007 Plea Agreement (in addition to any appreciation of the funds in that account) have been exhausted as a result of expenditures on future maintenance or future repairs on the CA/T.

5.1.3    For purposes of section 5.1.1, "Major Structural Concrete Flaw" means a flaw in a concrete structure or element of the CA/T project that is caused primarily due to concrete supplied by AI NE and not attributed to design or constructability defects that require the closing or downgrading of the operating condition or function of a structure until corrective measures/actions are taken that will return the structure to its as-designed condition or that requires extensive repairs or non-routine long-term maintenance to maintain the durability of the concrete. AI NE, FHWA and MTA will attempt in good faith to determine by mutual agreement whether a Major Structural Concrete Flaw is caused primarily by AI NE supplied concrete. To the extent there is a disagreement as to whether a Major Structural Concrete Flaw is caused primarily by AI NE supplied concrete, such disagreement will be resolved by a fact-finding process agreed to by the FHWA, AI NE and AI NE's general liability insurer or, as a matter of last resort, determined by a final judgment of a court of competent jurisdiction. The insurance policy or policies shall cover damages for which AI NE is found liable pursuant to this Part (Part 5), including, where applicable, investigation, material and labor costs

associated with the defect identification and repair or replacement of a structure or structural element. Routine maintenance repairs are excluded.

5.1.4   This insurance will apply only to AI NE's liability in damages for repairs required as a result of non-compliant concrete delivered by AI NE and does not apply to concrete flaws unrelated to and beyond the specifications, construction activities, or maintenance activities at the CA/T beyond AI NE's control.

5.1.5   AI NE shall have sixty (60) days from the date of this Agreement to obtain these insurance policy(ies).

5.1.6   The FHWA's rights and obligations under this Part (Part 5) may be assigned, in whole or in part, to the MTA.

## PART 6. CONCRETE TESTING PROGRAM

### 6.1   AI NE Reimbursement of Testing Costs

6.1.1   AI NE will reimburse FHWA (or, if FHWA accomplishes its testing program through the Commonwealth of Massachusetts) up to $500,000 of any testing that is attributable to locating, testing, and analyzing non-compliant concrete delivered by AI NE to the CA/T project.

### 6.2   Mutual Cooperation

6.2.1   In advance of future testing, FHWA agrees to give AI NE and its consultant, CTL Group ("CTL"), a reasonable opportunity to provide comments to FHWA regarding the scope and methodology of the testing procedures that FHWA intends to use for such future testing. In addition to AI NE and CTL receiving advance notice of future testing and a reasonable opportunity to provide comments, upon submission of any request for payment, AI NE will be afforded a reasonable opportunity to verify, in good faith, that the expenses underlying the payment request are attributable to locating, testing, and analyzing non-compliant AI NE concrete. In making this determination, the FHWA will cooperate with AI NE to provide it with the necessary information, subject to prior approval by the Department of Justice and the Office of Inspector General of the U.S. Department of Transportation (and the Massachusetts Attorney General's Office if testing is conducted through the Commonwealth of Massachusetts), in order to make this determination.

6.2.2   Prior to the execution of this Agreement, FHWA will use best efforts to provide AI NE and CTL with all materials relating to the scope and methodology of all testing already undertaken, and will consider CTL comments on such scope and methodology. AI NE agrees that the FHWA has already provided AI NE with the information relating to the scope and methodology of testing already undertaken. The FHWA will also use best efforts to provide AI NE and CTL with any test results that are complete and available prior to the execution of this Agreement. Additionally, upon AI NE's payment of the sums required pursuant to section 6.1.1, the FHWA agrees to disclose to AI NE the results of any tests, subject to prior approval by the Department of Justice and Office of Inspector General of the U.S. Department of Transportation (and the Massachusetts Attorney General's Office if testing is conducted through the Commonwealth of Massachusetts), conducted for the purpose of analyzing non-compliant concrete delivered by AI NE.

6.2.3   AI NE will fully cooperate in FHWA's identification and testing of all poured and allegedly non-compliant concrete delivered to the CA/T project, and make all of its records, and employees (including CTL and other consultants) available. AI NE will also make reasonable efforts to assist in obtaining the cooperation of any knowledgeable former employees for this purpose.

### 6.3    CA/T Maintenance Trust Account

6.3.1   Any payments made pursuant to section 6.1.1 of this Agreement will be in addition to the CA/T maintenance trust account specified in the July 26, 2007 Plea Agreement that is being established and funded with damages paid by AI NE. AI NE agrees that this maintenance account may fund additional concrete testing of the CA/T project that may be beyond the scope of this provision.

### PART 7. MONITORING PROGRAM

### 7.1    General

7.1.1   AI NE shall employ a monitor that reports to, and is controlled by, the monitoring agencies and any designees, and ensures the monitoring agencies and any designees that AI NE is conducting business in a lawful and ethical manner. The employment of a monitor by AI NE is a necessary condition to the FHWA's agreement not to suspend or debar AI NE, as provided in sections 2.1.1, in order to reduce the risk to the FHWA of continuing to do business with AI NE.

### 7.2    Control

7.2.1   The monitor shall be subject to the exclusive control and direction of the monitoring agencies. Additionally, the FHWA, in its discretion, may allow other designees control over the monitor.

### 7.3    Term

7.3.1    AI NE shall employ a monitor for a period of five (5) years from the date of the execution of the contract between AI NE and the monitor or the date of this Agreement, whichever occurs later. After a period of three years, AI NE may request the FHWA to terminate or modify the monitoring requirement. FHWA will give AI NE's request favorable consideration if the FHWA determines: (A) AI NE has made all required payments to the CA/T maintenance account; (B) the monitor has not found any major compliance issues; (C) AI NE has fully cooperated with the monitor; (D) AI NE demonstrates, and the monitor confirms, that it has established adequate policies and controls; (E) AI NE demonstrates, and the monitor confirms, that AI NE is fully implementing and carrying-out its compliance program; and (F) the Chief Executive of AI NE executes an affidavit, in a form acceptable to the FHWA, certifying that the company, to the best of his or her knowledge, is in full compliance with all applicable laws, regulations and contract specification. The FHWA will make a good faith determination as to whether to waive or modify the fourth and/or fifth years of the monitoring requirement and such determination will be final and not subject to judicial review.

### 7.4    Selection

7.4.1    The monitoring agencies will select the monitor. The monitor must have adequate expertise, resources, and independence from AI and AI NE as determined by the monitoring agencies. It is the intention of the FHWA to select Huron Consulting Group as the monitor.

7.4.2    AI and AI NE may propose monitors to the monitoring agencies, but the monitoring agencies are not bound to consider or accept any such monitor that may be proposed.

7.4.3    The monitoring agencies will consult with AI and AI NE on the monitor's fees prior to selection. However, the monitoring agencies will ultimately decide whether the fees are reasonable.

7.4.4    If, for any reason, the selected monitor is unable to fulfill its responsibilities, the monitoring agencies will promptly select a new monitor for the duration of the previous monitor's term. The new monitor will be selected in the same manner as provided in section 7.4.1 – 7.4.3 and subject to all the terms and conditions provided in this Agreement.

### 7.5    Monitor Contract

7.5.1    Once AI NE has been notified by the FHWA that the monitoring agencies have selected a monitor, AI NE shall enter into a contract providing for all applicable terms and duties under this Agreement.

7.5.2   AI NE, and the monitor shall execute a contract within two (2) weeks after the FHWA notifies AI NE that the monitor has been officially selected, unless extended by the FHWA for good cause.

7.5.3   The contract shall include any such terms and conditions deemed necessary or otherwise desirable by the monitoring agencies, including a provision providing for the termination of the contract by the FHWA for convenience, and shall be subject to the monitoring agencies approval before it is executed.

### 7.6    Funding

7.6.1   All expenses and fees of the monitor will be the sole responsibility of AI NE.

7.6.2   AI NE shall fund and establish an escrow account through which the monitor's expenses will be paid. The escrow account shall be maintained by an independent trustee who will pay all the monitor's fees and expenses from the funds in the account. The trustee shall have complete discretion as to the payment of the monitor's invoices.

7.6.3   Should any dispute arise as to whether any activity or expense either falls within the scope of the contract or this Agreement or is necessary, the trustee shall promptly file a protest with the FHWA stating the basis for the protest. The FHWA, in coordination with other monitoring agencies and designees, as appropriate, will then make a decision as to the matter in dispute and the FHWA's decision will be final.

### 7.7    Scope of Monitoring Program

7.7.1   Generally, the scope of the monitoring program shall include AI NE's performance of all DOT funded contracts, and any other public contracts within the discretion of the FHWA, and any AI NE's business operations related to the performance of such contracts. Additionally, the monitoring program shall include AI's controls and oversight processes and policies related to the oversight of AI NE's business operations.

### 7.8    Specific Duties of the Monitor

7.8.1   Within sixty (60) days after the execution the contract with the monitor, the monitor shall complete a review the controls and oversight processes and policies of AI to ensure AI is adequately overseeing the operations of AI NE and evaluate the effectiveness of any such controls and oversight processes and policies. AI shall implement any necessary and reasonable changes identified by the monitor.

7.8.2   The monitor may, at any time, make recommendations to AI with respect to the effectiveness of AI's controls and oversight processes and policies with respect to AI NE.

7.8.3    The monitor shall examine and investigate all aspects of AI NE's business involved or otherwise connected with the performance of any contract funded by the DOT, and any other public contracts within the discretion of the FHWA. Such examination and investigation shall be conducted to ensure compliance with all applicable laws, rules, and regulations (including, but not limited to, those related to antitrust, claims to the government, statements to the government, quality control/quality assurance, DBE, Davis-Bacon, bribery, gratuities, kickbacks), and contract specifications.

7.8.4    Within 60 days after execution of the contract with the monitor, the monitor shall complete a review of all AI NE internal controls and policies related to the performance of public contracts, including those concerning antitrust compliance, quality control/quality assurance, and the submission of claims or invoices. AI NE shall implement any reasonable changes identified by the monitor.

7.8.5    The monitor shall conduct regular audits as appropriate to ensure AI NE's compliance with all applicable laws, rules, and regulations (including, but not limited to, those related to antitrust, claims to the government, statements to the government, quality control/quality assurance, DBE, Davis-Bacon, bribery, gratuities, kickbacks), contract specifications, and internal controls and policies.

7.8.6    AI NE's Compliance Department shall maintain its existing hotline telephone number that any AI NE employees, subcontractors, suppliers, or general contractors may contact to report illegal or improper conduct. Such contacts may, at the discretion of the caller, remain anonymous. AI NE shall report such calls to AI, and AI shall in turn report to FHWA any non-compliance and remedial actions applied thereto as set forth in section 4.1.1 of this Agreement. AI NE shall distribute this hotline number to all employees, subcontractors, suppliers, and general contractors with a statement explaining the purpose of the number, and that any complaints made to the number will be confidential. The monitor shall regularly review AI NE's implementation and administration of its hotline. AI NE shall maintain a record of all calls received through the hotline and the nature of the complaint of any such call, which shall be made available to the monitor upon request. If the monitor deems necessary, it may establish its own hotline telephone number that AI NE employees, subcontractors, suppliers, or general contractors may contact to report illegal or improper conduct. In such case, AI NE shall ensure that the monitor's hotline telephone number is distributed in the same manner as its own hotline telephone number. AI and AI NE shall expressly agree that no employee, subcontractor, supplier, or general contractor will suffer any consequences from AI NE, AI, or any of AI's subsidiaries, for making any report to the hotlines.

7.8.7    The monitor shall conduct regular and periodic on-site project inspections to ensure that any DOT funded projects, and any other public contracts within the discretion of the FHWA, are being constructed in accordance with applicable contract specifications, laws and regulations. To the extent that approval by a third party is necessary for access to any AI NE work sites, AI NE shall use its best efforts to secure the consent of such third party for the monitor's access.

7.8.8   The monitor shall conduct regular and periodic inspections of AI NE's plants and other facilities to ensure that all controls are being followed, all applicable contract specifications are being met, and the company is complying with all applicable laws and regulations.

### 7.9     Cooperation

7.9.1   Both AI NE and AI will fully cooperate with the activities of the monitor.

7.9.2   The monitor shall have access to all AI records and documents concerning the controls and oversight processes and policies over AI NE. AI shall provide reasonable access to any employee knowledgeable about such controls and oversight processes and policies.

7.9.3   The monitor shall have access to all employees, information, and records of AI NE without exception. Such information and records include, but not be limited to, all books, records, logs, ledgers, files, accounts, computer and electronic records, documents, correspondence, proposals, bids, e-mail, tax returns, and payroll and personnel records. AI NE shall provide the monitor access to all employees and assist the monitor in obtaining access to or information from former employees. The monitor will not disclose any AI NE trade secrets or information obtained in any personnel file except if deemed necessary as part of a report or other communication to the monitoring agencies and other designees. The monitor shall also have access to all information generated and developed by any prior monitors. In the event AI NE objects to disclosing any records or information to the monitor on the basis of attorney client privilege, AI NE will provide to the consultant the date, author, and nature of the document or information. The monitor will report the assertion to the FHWA, and a determination will then be made on proceeding further. The FHWA agrees to refrain from compelling AI NE from performing any act that would constitute an express or implied waiver of the attorney client privilege. However, AI NE shall produce any record or information the FHWA deems necessary for the monitor to effectively monitor AI NE as permitted under this Agreement.

7.9.4   AI NE will provide the monitor with access to, and exclusive use of, appropriate workspace that is both private and secure. AI NE will also provide the monitor access to adequate copying and communications equipment.

7.9.5   AI and AI NE will promptly notify the FHWA and the monitor if they know, or have reason to know, they are under investigation by a law enforcement authority and if any law enforcement authority makes a request for information, including issuance of a subpoena.

## PART 8. CORPORATE INTEGRITY PROGRAM

8.1.1   Within sixty (60) days after the execution of this Agreement, AI and AI NE, under the monitor's oversight and with the monitor's cooperation and input, shall institute an effective AI NE Corporate Integrity Program that includes both a Code of Business Ethics and Corporate Compliance Program. AI and AI NE will be given the opportunity to present the monitor with the existing AI NE compliance and ethics programs, and the monitor will consider those existing programs as the components of the AI NE Corporate Integrity Program.

8.1.2   The Code of Business Ethics for AI NE shall, at a minimum, include the following elements:

A. Commitment by the organization's top management to abide by the code and ensure that all employees are aware of and abide by the code;
B. Applies to all levels of the organization;
C. A letter from the president or chief executive of the organization communicating what the code is and the organization's commitment to following the code;
D. A table of contents so that employees will be able to easily find the organization's policy for a specific issue;
E. A statement of policy concerning the code and the general rules that apply to the code;
F. Contain standards that communicate what issues employees should be aware of and what to do whenever confronted with any such issue;
G. A statement requiring employees to report suspected violations and to cooperate with the implementation of the code; and
H. A statement that clearly communicates the consequences for code violations.

8.1.3   The Corporate Compliance Program for AI NE shall have the following elements:

A. The company's governing authority, top management, and parent company must fully support all elements of the program. This includes being knowledgeable about the content and operation of the program and exercising oversight with respect to the implementation and effectiveness of the program;
B. A specific individual within the company is appointed as the Corporate Compliance Officer, who is responsible for the day-to-day administration and implementation of the program. This position should be a separate, independent position within the company that only reports to the company's top executive officer and parent company;
C. The program shall include regular training of all employees, including top management, regarding the both the program and code of business ethics. The program should also include legal training on compliance with specific regulatory areas that are directly applicable to the company;

D. The program shall include procedures for employees and others to confidentially report suspected violations and to safeguard the confidentiality of the source. The program shall also prohibit any form of retaliation for reporting a suspected violation;

E. The program shall require investigations of all suspected violations and shall include procedures to safeguard the confidentiality of such investigations;

F. The program shall include requirements to regularly audit the company's internal accounting controls and other procedures to ensure their effectiveness in safeguarding against inaccuracies, fraud, or other misconduct;

G. The program shall commit to providing sufficient resources, including the hiring of consultants and outside auditors, investigators, and legal counsel, in the administration and implementation of the program; and

H. The program shall ensure that appropriate steps will be taken whenever a violation occurs or whenever deficiencies are found in the company's control systems or whenever recommendations are otherwise made to improve the company's ethical and legal compliance.

8.1.5    The monitor shall oversee AI NE's implementation of the Corporate Integrity Program, but AI and AI NE shall be responsible for the development, implementation, and adequacy of the AI NE Corporate Integrity Program.

8.1.6    The monitor shall conduct regular audits as appropriate to ensure that AI and AI NE are adequately implementing the AI NE Corporate Integrity Program and that the Corporate Integrity Program is effective.

8.1.7    AI and AI NE shall institute any reasonable changes to the AI NE Corporate Integrity Program as may be required by the monitoring agencies or the monitor.

## PART 9. REPORTS

### 9.1    Reports by the Monitor

9.1.1    The monitor shall report monthly to the monitoring agencies on AI NE's activities and compliance.

9.1.2    The monitor shall submit written quarterly reports on all activities conducted by the monitor, as well as AI and AI NE's compliance with the monitoring agreement, to the monitoring agencies. Such reports will be provided to both AI and AI NE by the monitor within thirty (30) days after submission to the monitoring agencies.

9.1.3    The monitor may make other reports to the monitoring agencies at any time as deemed appropriate. Such reports may be made on the monitor's own initiative or pursuant to a request from the monitoring agencies. Such reports will be disclosed to either AI or AI NE within thirty (30) days after submission to the monitoring agencies.

9.1.4    The monitor may make any communications to the monitoring agencies in whatever form, concerning any matter in confidence.

9.1.5    The monitor may make reports to other government designees at the discretion of the FHWA.

9.1.6    Within six (6) months, the monitor shall submit a report to the monitoring agencies concerning its activities related to the review of AI's controls and oversight processes and policies with respect to AI NE, AI NE's internal controls and policies, and AI NE's development and implementation of its Corporate Integrity Program. Such report shall also include the monitor's assessment of the effectiveness of AI's controls and oversight processes and policies with respect to AI NE, AI NE's internal controls and policies, the changes made to these internal controls and policies, and the development, implementation, and adequacy of AI NE's Corporate Integrity Program.

## PART 10. MISCELLANEOUS

10.1.1    If FHWA or the United States Attorney's Office for Massachusetts provides AI NE with credible information of additional individuals at AI NE being culpable of wrongdoing in connection with AI NE's alleged use of non-specification concrete on the CA/T project, AI NE will terminate those additional individuals.

10.1.2    AI NE shall provide FHWA with evidence of its termination of Robert B. Peckham.

10.1.3    Except as otherwise provided for in this Agreement or in the July 26, 2007 Plea Agreement, the United States and the Commonwealth of Massachusetts reserve the right to seek indemnification from AI NE in the event a claim is filed by a third party against either the United States or Massachusetts for damages resulting from non-compliant concrete delivered by AI NE to the CA/T project.

10.1.4.    Nothing in this Agreement shall be construed to require AI or AI NE to disclose information protected by the attorney-client privilege, and nothing in this Agreement constitutes a waiver of AI's or AI NE's attorney-client privilege protections. Except as required to enforce this Agreement, all confidential commercial or financial information of AI or AI NE shall be kept confidential by the monitor, the monitoring agencies, or any agency that is entitled to receive the information under the terms of this Agreement.

10.1.5    It is understood that any information in the FHWA's possession pursuant to the terms of this Agreement, are subject to the Freedom of Information Act (FOIA) and the USDOT's implementing regulations under 49 C.F.R. Part 7. To the extent that any information satisfies the criteria in Exemption 4 of FOIA, the FHWA, in accordance with 49 C.F.R. Part 7, will notify AI NE that a request has been made and identify the records the FHWA has in its possession that are responsive to the request. AI NE will then have the opportunity, pursuant to 49 C.F.R. 7.17, to object to the release of any such record.

10.1.6  This Agreement shall have only one original, which shall be maintained by the FHWA. All other signatories to this Agreement shall receive copies.

10.1.7  The FHWA hereby attests that DOT has consented to and is in agreement with this Agreement.

10.1.8  This Agreement shall be effective on the date of signature by the FHWA debarring official.

Aggregate Industries Northeast Region, Inc.

By: _____          7/26/07
    Roberto Huet, President              Date

Counsel for
Aggregate Industries Northeast Region, Inc.

_____              7/26/07
R. Robert Popeo, Esq.                   Date

Aggregate Industries Management, Inc.

By: _____          7/26/07
    Louis Beauchemin, President          Date

Counsel for
Aggregate Industries Management, Inc.

_____              7/26/07
R. Robert Popeo, Esq.                   Date

_____              7/26/07
King W. Gee                             Date
Debarring Official
Federal Highway Administration